**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| ELÍAS SÁNCHEZ-SIFONTE, et al, **Plaintiffs,** v. JOSUE FONSECA, et al, **Defendants.** | **Civil No. 22-1444** (RAM) |

<u>**OPINION AND ORDER**</u>

RAÚL M. ARIAS-MARXUACH, United States District Judge.

Pending before the Court is Defendants Telemundo of Puerto Rico LLC ("Telemundo PR"), TM Television, Inc. ("TM Television"), Antonio Mojena, Josue ("Jay") Fonseca, Jagual Media LLC ("Jagual"), NBCUniversal Media, LLC ("NBC"), and Telemundo Network Group LLC's ("TNG") (collectively, "Defendants") *Motion to Dismiss* ("*Motion*") Plaintiffs Elías Sánchez-Sifonte ("Sánchez") and Valerie Rodríguez-Erazo's ("Rodríguez") (collectively, "Plaintiffs") Second Amended Complaint ("SAC"). (Docket No. 133). For the reasons set forth below, Defendants' *Motion* is **GRANTED IN PART** and **DENIED IN PART**.

**I.   BACKGROUND**

**A.   Factual Background**

Plaintiffs are former residents of Puerto Rico who became embroiled in Puerto Rico's summer of 2019 "TelegramGate" scandal

involving former Governor of Puerto Rico Ricardo Rosselló. As set forth in the SAC, Sánchez was an attorney, consultant, and lobbyist in Puerto Rico who also served as campaign manager and transition team chairman for then-Governor Rosselló. (Docket No. 130 ¶ 8). Rodríguez is Sánchez's wife and a practicing attorney. Id. ¶ 9.

In the summer of 2019, hundreds of pages of private group chat messages between Rosselló and other individuals, including Sánchez, were leaked to the public. (Docket No. 73 at 2, 11). The messages led to major protests in Puerto Rico and, ultimately, to the Governor's resignation. Id. at 2. Most of the stories at issue in this case were published during that summer.

Broadly speaking, Plaintiffs claim to have suffered economic, emotional, and reputational damages because Defendants published defamatory statements about them. (Docket No. 130 ¶¶ 5-6). Plaintiffs assert twenty counts of defamation. Id. ¶¶ 124-270. Each count corresponds to a single publication.[1] Id. Plaintiffs seek $5 million in compensatory damages for the alleged harm to their reputations, $30 million in consequential damages for the alleged harm to their business and property, and punitive damages. Id.

---

[1] Count One involves a July 16, 2019 broadcast that also replayed a segment from an April 16, 2019 broadcast. (Docket No. 130 ¶ 34).

B.    **Procedural Background**

Plaintiffs originally filed this action in Florida state court on December 31, 2020. (Docket No. 1-2). On February 9, 2021, Defendants removed the state court action to the U.S. District Court for the Southern District of Florida based on diversity of citizenship. (Docket No. 1).

On November 1, 2021, the U.S. District Court for the Southern District of Florida granted in part Defendants' motions to dismiss Plaintiffs' first complaint as an improper shotgun pleading and ordered Plaintiffs to amend it to be consistent with the federal pleading standard. (Docket No. 67). Plaintiffs filed an amended complaint on November 23, 2021. (Docket No. 69). TM Television sought its dismissal for lack of personal jurisdiction. (Docket No. 73). In the alternative, it requested the case be transferred to the United States District Court for the District of Puerto Rico pursuant to 28 U.S.C. § 1404(a). Id. The remaining Defendants filed a motion to dismiss the amended complaint (on the same procedural and substantive grounds raised in the present *Motion*) and joined in the motion for venue transfer. (Docket No. 74). On August 12, 2022, Magistrate Judge Melissa Damian recommended that the transfer request be granted and that the motions to dismiss be dismissed as moot. (Docket No. 105 at 22, 34). The Report & Recommendation was affirmed and adopted on September 8, 2022, and

the case was transferred to this District on September 13. (Docket Nos. 108 and 110).

Once the case was transferred, Plaintiffs filed the SAC on November 9, 2022. (Docket No. 130). On November 22, Defendants filed the present *Motion* seeking dismissal of the SAC on various procedural and substantive grounds. (Docket No. 133). Plaintiffs filed an opposition to the *Motion* on December 16, 2022, and Defendants replied on January 13, 2023. (Docket Nos. 143 and 144).

## II.   DISCUSSION

### A.   Procedural Challenges to the SAC

The Court starts with Defendants' procedural challenges to the SAC. They assert the SAC is still a shotgun pleading and that Plaintiffs did not provide pre-suit notice for ten statements.[2] As explained below, the Court finds (1) the SAC is not a shotgun pleading and (2) the ten statements Plaintiffs allegedly failed to notify are not actionable, as Plaintiffs concede.

#### 1.   Shotgun Pleadings

##### a. Applicable Law

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Such statement "needs only

---

[2] Defendants' *Motion* states that there are eleven statements for which Plaintiffs did not provide notice, but Defendants' exhibit contains only ten statements. (Docket No. 133-1).

enough detail to provide a defendant with fair notice of what the

... claim is and the grounds upon which it rests." Ocasio-Hernández

v. Fortuño-Burset, 640 F.3d 1, 11-12 (1st Cir. 2011) (citations

and internal quotation marks omitted). Pursuant to Rule 10(b),

> A party must state its claims or defenses in
> numbered paragraphs, each limited as far as
> practicable to a single set of circumstances.
> A later pleading may refer by number to a
> paragraph in an earlier pleading. If doing so
> would promote clarity, each claim founded on
> a separate transaction or occurrence—and each
> defense other than a denial—must be stated in
> a separate count or defense.

Fed. R. Civ. P. 10(b).

These rules exist so that the party being sued "'can discern

what [the plaintiff] is claiming and frame a responsive pleading.'"

Barmapov v. Amuial, 986 F.3d 1321, 1324 (11th Cir. 2021) (quoting

Weiland v. Palm Beach Cnty. Sheriff's Off., 792 F.3d 1313, 1320

(11th Cir. 2015)). A defendant must be able to "understand 'the

grounds upon which each claim [against him] rests.'" Id. at 1326

(quoting Weiland, 792 F.3d at 1322-23). See also Ocasio-Hernández,

640 F.3d at 12 ("an adequate complaint must provide fair notice to

the defendants and state a facially plausible legal claim").

"A shotgun pleading is a complaint that violates either

Federal Rule of Civil Procedure Rule 8(a)(2) or Rule 10(b), or

both." Barmapov, 986 F.3d at 1324 (citing Weiland, 792 F.3d at

1320). The Eleventh Circuit has identified four types of shotgun

pleadings: (1) "'a complaint containing multiple counts where each

count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint[;]'" (2) "a complaint that is 'replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action[;]'" (3) "a complaint that does not separate 'each cause of action or claim for relief' into a different count[;]" and (4) "a complaint that 'assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.'" Id. at 1324-25 (quoting Weiland, 792 F.3d at 1321-23).

### b. Analysis

The District Court for the Southern District of Florida had ordered Plaintiffs to amend their first complaint because it was an improper shotgun pleading that failed to give Defendants fair notice of the claims against them and the facts upon which those claims were based. (Docket No. 67 at 4). Plaintiffs' first complaint had seven counts incorporating by reference 290 paragraphs of factual allegations regarding over 100 allegedly defamatory statements across twenty-five publications without any indication as to which defendants were responsible for each publication. Id. at 5-6. It also "improperly attempt[ed] to assert multiple claims in a single count." Id. at 8.

Defendants assert that Plaintiffs' SAC does not cure these deficiencies. (Docket No. 133 at 6). While there may be room for improvement, Plaintiffs' SAC does satisfy the purpose of these procedural rules: giving Defendants notice of the "grounds upon which each claim [against them] rests" so they can frame a responsive pleading. Weiland, 792 F.3d at 1323. The SAC is divided into twenty counts. Each count corresponds to a different publication and lists the Defendants allegedly responsible for that publication.[3] Thus, unlike the complaint dismissed in Barmapov, this complaint gives each Defendant notice of the acts they are charged with (*i.e.,* the allegedly defamatory publications they are accused of having published).[4] The Court sees no issue with the fact that each count is brought against multiple Defendants, as it is possible for multiple parties to be responsible for the same publication. Also, Plaintiffs are only grouped together in Count One because the publication at issue in Count One mentions both of them.[5]

As Defendants note, most factual allegations are not incorporated into any count; each count just incorporates the

---

[3] Count One involves a July 16, 2019 broadcast that also replayed a segment from an April 16, 2019 broadcast. (Docket No. 130 ¶ 34).
[4] For a chart summarizing which count pertains to which publication, *see infra* Part III.
[5] Whether each allegedly defamatory statement within that publication is "of and concerning" both Plaintiffs is a different issue the Court addresses *infra* Part II.B.1.

paragraphs containing the allegedly defamatory statements. However, this format ultimately clarifies which allegedly defamatory publications and statements correspond to which counts.

Defendants also contend that the SAC, as organized, makes it unclear whether Plaintiffs seek to hold certain Defendants liable for statements they did not publish. (Docket No. 133 at 9). However, at the motion to dismiss stage it is not the Court's role to evaluate the veracity of Plaintiffs' allegations. *See* Ocasio-Hernández, 640 F.3d at 12. Defendants also allege that the SAC's structure makes it impossible for certain Defendants who are improper parties to remove themselves from the case, (Docket No. 133 at 6 n.7), but the SAC's structure does not hinder Defendants from raising such defenses under Rule 12(b)(6).

Finally, Defendants argue that the SAC is confusing because in some instances, it assigns the same defamatory meaning to different publications. (Docket No. 133 at 8-9). However, multiple publications can have the same defamatory meaning. In this case, the publications that were assigned the same defamatory meaning were published the same day and reported the same story. Thus, it is plausible to allege that they contain the same defamatory meaning.

"Our federal rules promote the disposition of claims on the merits rather than on the basis of technicalities . . . and courts should be reluctant to impose a dismissal with prejudice for a

rules violation that is neither persistent nor vexatious, particularly without some review of the merits." Kuehl v. FDIC, 8 F.3d 905, 908 (1st Cir. 1993) (internal citation omitted) (stating that dismissal based on over-drafting would be an overly harsh penalty but affirming the lower court's dismissal on other grounds). *See also* Miranda v. United States, 105 F. App'x 280, 281 (1st Cir. 2004) ("'Dismissal [for noncompliance with Rule 8] is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.'" (quoting Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988))). In line with this principle and given that Defendants have fair notice of the publications through which they are accused of having defamed Plaintiffs, the Court finds that the SAC is not a shotgun pleading that warrants dismissal.

## 2. Pre-Suit Notice

Defendants' second procedural ground for dismissal is that Plaintiffs did not provide pre-suit notice for ten of the statements as required by Section 770.01 of the Florida Statutes.[6] (Docket No. 133 at 9-11). However, Plaintiffs concede that these ten statements "are not defamatory and not part of the Counts

---

[6] The Court notes that all parties rely exclusively on Florida law regarding defamation in their pleadings. Moreover, neither party has raised a conflict of law issue. Therefore, the Court applies Florida law at this juncture.

alleged in the Complaint." (Docket No. 143 at 12). They assert that these statements were included "to give context to the actual allegations[.]" Id.

The Court notes that Defendants' response to these ten statements is understandable considering that Plaintiffs explicitly characterize them as defamatory throughout the SAC. Given Plaintiffs' concession, the Court **GRANTS** Defendants' *Motion* as to these ten statements and holds that they are not independently actionable. The ten statements are:

- Paragraphs 48(b)-(d)
- Paragraphs 70(a)-(b)
- Paragraph 70(c) ("Look, . . . You gave it to him. Not me, you.")
- Paragraph 77(d) ("Diaz Olivo: That will have to be determined, . . . he evaded them or stuttered more than usual.")
- Paragraph 77(e)
- Paragraphs 116(b)-(c)

(Docket No. 133-1).

The Court may nonetheless consider these statements, and any others in the publications at issue, exclusively as context for the remaining allegedly defamatory statements. *See* Byrd v. Hustler Mag., Inc., 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983) ("a publication must be considered in its totality" and courts "must consider all the words used, not merely a particular phrase or sentence"); Bongino v. Daily Beast Co., LLC, 477 F. Supp. 3d 1310, 1317-18 (S.D. Fla. 2020); Jews for Jesus, Inc. v. Rapp, 997 So. 2d

1098, 1108-09 (Fla. 2008) (citing *Standard Jury Instructions—Civil Cases (No. 00-1)*, 795 So. 2d 51, 57 (Fla. 2001)).

**B.   Substantive Challenges to the SAC**

Defendants also challenge some of the claims in the SAC, arguing that Plaintiffs failed to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). When faced with such a challenge, courts must determine whether "*all* the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible." Ocasio-Hernández, 640 F.3d at 14 (emphasis in original) (citations omitted). This requires treating "any non-conclusory factual allegations in the complaint as true, 'even if seemingly incredible.'" Nieto-Vicenty v. Valledor, 984 F. Supp. 2d 17, 20 (D.P.R. 2013) (citing Ocasio-Hernández, 640 F.3d at 12).

**1.   "Of and Concerning" Plaintiffs**

Defendants first allege that some of the statements are not "of and concerning" one or both Plaintiffs. (Docket No. 133 at 11-13). Whether a statement is "of and concerning" the plaintiff is typically a question of fact for the jury, unless the statement is incapable of supporting a jury's finding that it refers to the plaintiff. *See* Thomas v. Jacksonville Television, Inc., 699 So. 2d 800, 805 (Fla. Dist. Ct. App. 1997) (citations omitted).

### a. Count One – July 16, 2019 Broadcast

The first set of statements that Defendants challenge on "of and concerning" grounds is from the July 16, 2019 broadcast that is the subject of Count One, which is republished at paragraph 37 of the SAC:

(a)   [Valeria Collazo] Under the condition of anonymity, employees of the Department have denounced the strong influence of the marriage of Elias Sánchez and Valerie Rodríguez within the agency. They assure that they have been in charge of placing their relatives in key positions.

(b)   [Altered Voice] From the first day of this Administration, the presence of Mr. Elias Sánchez has been felt.

(c)   [Jay Fonseca] And who else does he mention in the affidavit? [Valeria Collazo] He mentions Elias Sánchez in several instances, right? His marriage to Valerie Rodríguez, but particularly, and this is very important because this contract was actually awarded, he mentions that... let me see if the date is here... I think it is on this page... well, anyway, they intended to award a technology contract for 11 million per year, and what this person was explaining was "but, the Federal government has a program to handle that, exactly in the same fashion, and it costs one million, for 2 years."

(d)   [Jay Fonseca] Here is the date: "The letter was dated October 25th, which was an oversight on my part." So, on a letter he says "look, but why are we going to spend 11 million dollars, if the federal government gives us this for free, the same thing that application does, why would we pay 11 million?... the government gives this for free."

(e)  [Valeria Collazo] 11 million for one year… I
mean the federal government: one million, two
years. And that contract was with Microsoft,
it was granted, and the lobbyist for that
company is Elias Sánchez.

(Docket No. 34-2 at 4-8 (certified translation of statements at
Docket No. 130 ¶ 37(a)-(e)).[7] Defendants correctly note that the
statements at paragraphs 37(b) and 37(e) are not of and concerning
Rodríguez. They make no reference to her either directly or
indirectly. They are only about Sánchez.

Plaintiffs attempt to impute a defamation claim onto
Rodríguez in several different ways. **First**, Plaintiffs cite <u>Brewer
v. Memphis Pub. Co.</u>, 626 F.2d 1238 (5th Cir. 1980), *cert. denied*,
452 U.S. 962 (1981) for the proposition that defamation of one
person could also defame another not specifically named,
especially in the case of spouses. (Docket No. 143 at 13). As
Defendants aptly note, however, the <u>Brewer</u> court found that the
husband had stated a defamation claim **independent** of his wife's
claim because the article about her necessarily implied that her
husband was a cuckold. *See* <u>Brewer</u>, 626 F.2d at 1244 ("John Brewer
did not assert his wife's claim but, instead, claimed that this
statement about her also defamed him."). As the Fifth Circuit
stated in <u>Brewer</u>, "a general principle of libel law is that only

---

[7] Given that Plaintiffs provide uncertified translations of the allegedly
defamatory statements at issue in violation of Local Rule 5(c), the Court relies
on Defendants' certified translations throughout this *Opinion and Order*.

the person defamed, the person to whom the article refers, has a cause of action; his or her relatives do not." Id. *See also* Santilli v. Van Erp, 2018 WL 2172554, at *5 n.6 (M.D. Fla. 2018) (finding that the allegedly defamatory statements were not aimed at one of the plaintiffs), *report and recommendation adopted*, 2018 WL 2152095 (M.D. Fla. 2018); Patterson v. Downtown Med. & Diagnostic Ctr., Inc., 866 F. Supp. 1379, 1382 (M.D. Fla. 1994) (finding that the complaint did not support a defamation claim for the plaintiff because the statement was about her husband).

**Second**, Plaintiffs invoke the concept of group defamation. However, they cite to no case in which the concept of group defamation was applied to a couple.[8] Furthermore, the statements at paragraphs 37(b) and 37(e) do not reference Plaintiffs as a group such that they might "give rise to the conclusion that there is particular reference to the member" at issue here, *i.e.,* Rodríguez. Restatement (Second) of Torts § 564A. A statement that is only about Sánchez cannot give rise to a group defamation claim by Rodríguez if the statement is exclusively about him and not about their supposed "group."

---

[8] The Second Restatement of Torts provides several examples of actionable statements for group defamation purposes. These include defamatory statements about "officers of a corporation" where the corporation only has four officers; statements about "most of the sales staff of a department store" where there are only twenty-five of them; and statements about "all radio repairmen who solicit telephone calls and respond to them" in a community where there is only one radio repairman who solicits business in this manner. *See* Restatement (Second) of Torts § 564A.

**Third**, Plaintiffs argue that "partners may maintain a joint action for libel or slander which tends to injure the business of their firm, even though the defamatory words refer to or concern but one of its members." (Docket No. 143 at 13 (citing Melcher v. Beeler, 48 Colo. 233, 246 (1910)). Melcher is a 1910 Colorado case involving a couple who alleged libel **of their shared business**. *See* 48 Colo. at 245-46. The Court thus **GRANTS** Defendants' *Motion* with regard to the statements at paragraphs 37(b) and 37(e) and finds that they are not actionable by Rodríguez.

Defendants also allege that the statement at paragraph 37(d) is not "of and concerning" either Plaintiff. In response, Plaintiffs invoke the concept of defamation by implication. (Docket No. 143 at 14). Defamation by implication occurs when facts are juxtaposed to create a defamatory connection between them, or where facts are omitted to create a defamatory implication. Jews for Jesus, 997 So. 2d at 1106-08; Klayman v. Jud. Watch, Inc., 22 F. Supp. 3d 1240, 1254-55 (S.D. Fla. 2014). However, defamation by implication stems from the publication of **truthful** statements that create a false and defamatory implication. *See* Jews for Jesus, 997 So. 2d at 1106-08; Klayman, 22 F. Supp. 3d at 1254-55. Because Plaintiffs' SAC alleges that each of the listed statements is false and not that they are true but create a defamatory implication, Plaintiffs are barred from asserting a claim for defamation by implication. *See* Corsi v. Newsmax Media, Inc., 519 F. Supp. 3d

1110, 1124 (S.D. Fla. 2021) ("The Complaint pleads only that Fairbanks' accusations were false—not that they were true and gave a false implication—which requires dismissal."), *appeal dismissed in part*, 2022 WL 3353776 (11th Cir. 2022), *and appeal dismissed in part*, 2022 WL 3350519 (11th Cir. 2022); <u>Klayman</u>, 22 F. Supp. 3d at 1255 (granting summary judgment in favor of the defendant on a defamation by implication claim because "[a]t issue is a statement that may be defamatory because it is false, not a factually true one that creates a false impression"); <u>Jacoby v. Cable News Network, Inc.</u>, 537 F. Supp. 3d 1303, 1313 (M.D. Fla. 2021) (dismissing the plaintiff's defamation by implication claim because they had alleged that the statement was false), *aff'd*, 2021 WL 5858569 (11th Cir. 2021).

Given that the statement does not reference Plaintiffs directly or indirectly, the Court **GRANTS** Defendants' *Motion* as to paragraph 37(d) and holds that it is not actionable by either Plaintiff.

### b. Count Two – October 8, 2019 Broadcast

Another set of statements that Defendants challenge on "of and concerning" grounds is from the October 8, 2019 broadcast at Count Two:

> (a) [Valeria Collazo] What some suspect is that this map is tailored to certain developers and individuals with high political influence.

(b)   [Pedro Cardona] One can conclude that there
      have been some orders made here.

(c)   [Valeria Collazo] Thank you for joining us.
      First, perhaps, a reaction to that
      information. I think you just found out about
      that contract?

(d)   [Pedro Cardona] Yes, well, this whole story
      really blows your mind. When you look at what
      his happening in the Planning Board and the
      fact that we may be seeing that the part of
      the agency's regulation is being privatized,
      that there is an external consultant who can
      propose modifications to the regulations
      disguised as doing related to Law Enforcement
      is worrisome.

(Docket No. 35-4 at 7, 9-10 (certified translation of statements
at Docket No. 130 ¶ 44)). Defendants argue that these statements
are not "of and concerning" Rodríguez. While the statements do not
mention her by name, they could be interpreted as being "of and
concerning" Rodríguez. The segment is about how the Planification
Board was redrawing zoning maps to benefit "individuals with high
political influence." The broadcast discusses Rodríguez's contract
with the Planification Board, stating that despite the Board's
denial, her contract does encompass work on these new maps. In
their context, a jury is capable of finding that these statements
refer to Rodríguez. The Court thus **DENIES** Defendants' *Motion* as to
paragraph 44.

### c. Count Eighteen – July 30, 2019 Broadcast

The final statement that Defendants challenge on "of and concerning" grounds is included in Count Eighteen of the SAC, which deals with the July 30, 2019 broadcast:[9]

> (a)  Itza García and William Villafañe were the people who opposed or hindered and continually asked that they do competitions instead of direct contracting for those things lobbied by Elías Sánchez.

(Docket No. 34-16 at 3-4 (certified translation of the statement at Docket No. 130 ¶ 111(a))).[10] Defendants allege that paragraph 111(a) is not "of and concerning" Sánchez because it is primarily directed at Itza García and William Villafañe. (Docket No. 133 at 12-13). Defendants' cited cases and the statements at issue therein are simply incomparable to this case and the statement at paragraph 111(a). A jury is capable of finding that this statement defames Sánchez because it suggests that he sought to skirt the competitive process in favor of direct contracting for his clients. Thus, the Court **DENIES** Defendants' *Motion* as to paragraph 111(a).

---

[9] The complaint lists this count as Count Thirteen, which appears to be a typographical error.

[10] Defendants also challenge the statements at paragraphs 116(b) and 120 as not being of "of and concerning" Sanchez. (Docket No. 144 at 6). The statement at paragraph 116(b) is not actionable because Defendants concede it is not defamatory. *See supra* Part II.A.2. As for Defendants' "of and concerning" challenge to paragraph 120, it was not raised in Defendants' *Motion* and is thus waived. *See* Small Just. LLC v. Xcentric Ventures LLC, 873 F.3d 313, 323 n.11 (1st Cir. 2017) (arguments developed for the first time in a reply brief are waived). Regardless, despite not mentioning him by name, the Court would not be able to conclude at this point that the statement could not be interpreted as referring to Mr. Sánchez.

### 2.    Defamatory Statement Requirement

Defendants next attempt to challenge many of the statements in the SAC, claiming that they are not capable of defamatory meaning. They argue that accusations of lobbying or influence peddling are not defamatory as a matter of law. However, the applicable case law shows that such statements may be defamatory depending on the circumstances.

"Whether a statement is susceptible to defamatory interpretation is a question of law left to the Court." Bongino, 477 F. Supp. 3d at 1317 (citation omitted). But "[i]f an allegedly defamatory publication is reasonably susceptible of two meanings, one of which is defamatory and one of which is not, it is for the trier of fact to determine the meaning understood by the average reader." Rubin v. U.S. News & World Rep., Inc., 271 F.3d 1305, 1306 (11th Cir. 2001). See also Bongino, 477 F. Supp. 3d at 1318. An allegedly defamatory statement must be viewed in the context of the entire publication. See Byrd, 433 So. 2d at 595 (stating that courts "must consider all the words used, not merely a particular phrase or sentence"); Bongino, 477 F. Supp. 3d at 1317-18. "The statement should be considered in its natural sense without a forced or strained construction." Byrd, 433 So. 2d at 595. See also McCormick v. Miami Herald Pub. Co., 139 So. 2d 197, 200 (Fla. Dist. Ct. App. 1962) ("The language of the published articles

should not be interpreted by extremes, but should be construed as the common mind would naturally understand it.").

Pursuant to Florida law, "words are defamatory when they charge a person with an infamous crime or tend to subject one to hatred, distrust, ridicule, contempt or disgrace or tend to injure one in one's business or profession." Seropian v. Forman, 652 So. 2d 490, 495 (Fla. Dist. Ct. App. 1995) (citation omitted).

In Seropian, the District Court of Appeal of Florida held that the term "influence peddling" was not capable of defamatory meaning because no one could interpret the letter at issue as accusing the plaintiff of influence peddling **of an illegal nature**. *See* id. at 495-96 ("no reader of these letters could seriously have believed that plaintiff was being charged with receiving a bribe or 'unlawful compensation' to endorse the Clinic's position"). The court opined that the term "influence peddling" did not "have the settled opprobrious meaning that the terms 'on-the-take', 'corrupt politician', e.g., or their moral equivalents, might have had if they had been used instead." Id. at 495. Similarly, in Bigelow v. Brumley, the Supreme Court of Ohio held that a false claim that the sponsor of an amendment is a paid lobbyist is not defamatory *per se* because "the statement complained of [does not] impute to the plaintiff the commission of an indictable offense." 37 N.E.2d 584, 592 (Ohio 1941).

Thus, if a defendant does not imply illegality, then statements about lobbying or influence peddling are not defamatory. But if the statements suggest lobbying or influence peddling of a more nefarious nature, then they are capable of defamatory meaning. The publications at issue here insinuate, and sometimes outright charge, that Plaintiffs engaged in corrupt and illegal conduct, not legitimate, run-of-the-mill lobbying. *See, e.g.,* Docket No. 34-8 at 12 (certified translation of statement at Docket No. 130 ¶ 76(d)) ("In the case of Sánchez, there are also undue and **illegal** interventions with cabinet secretaries." (emphasis added)); Docket No. 34-14 at 2 (certified translation of statement at Docket No. 130 ¶ 91(a)) ("Elías Sánchez is supposedly being investigated by the feds, right? Supposedly for selling influence." (emphasis added)). Thus, the Court cannot dismiss any of the claims on this basis.

### 3. Wire Service Privilege

Defendants also argue that the wire service privilege covers the July 17, 2019 publications (Counts Ten through Twelve). Count Ten involves Telemundo PR's verbatim republication of an article first published by the Centro de Periodismo Investigativo ("CPI") that same day. Counts Eleven and Twelve are a broadcast and a Facebook Live discussing the allegations in the CPI article.

When a media defendant republishes a defamatory statement originally published by a wire service recognized as a reliable

source, the defendant is generally not liable for the defamation. *See* Layne v. Tribune Co., 146 So. 234, 238 (Fla. 1933). This is because "requiring verification of wire service stories prior to publication would impose a heavy burden on the media's ability to disseminate newsworthy material." Appleby v. Daily Hampshire Gazette, 478 N.E.2d 721, 725 (Mass. 1985). The wire service defense has been expanded to encompass the republication of several news sources, like newspapers, periodicals, and other sources that have been deemed an "integral part of today's news information services." Nelson v. Associated Press, Inc., 667 F. Supp. 1468, 1477 (S.D. Fl. 1987).

Media defendants may nonetheless be liable for defamation for republishing information if they "acted in a negligent, reckless, or careless manner in reproducing it to another's injury." Layne, 146 So. at 238. For example, they could be held liable if they "had, or should have had, substantial reasons to question the accuracy of the articles or the bona fides of [the] reporter." Nix v. ESPN, Inc., 772 F. App'x 807, 813 (11th Cir. 2019) (citations and internal quotations marks omitted). *See also* Appleby, 478 N.E.2d at 724 (upholding the trial court's ruling that republications are not negligent unless the original publication "appears, on its face, to be inherently improbable"). If Defendants were "negligent or careless in condensing or summarizing other

sources of news information," that would "amount to an independent libel[.]" Nelson, 667 F. Supp. at 1477.

However, this Court is not aware of any case in which a court refused to grant the wire service defense on facial implausibility grounds. Nor do Plaintiffs provide one. And, as exemplified by Nelson, even an incredulous story may not necessarily give a re-publisher substantial reason to question its accuracy depending on the context. *See* id. at 1482.

Plaintiffs argue that the July 17, 2019 publications are not privileged because Defendants had substantial reason to question the original CPI article. (Docket No. 143 at 21). They claim that it had inconsistencies that should have put Defendants on notice, and that Fonseca even admitted to having doubts about the allegations therein. Id.

As to Fonseca's alleged doubts, Plaintiffs do not specify when and how Fonseca expressed these doubts. Defendants are left to speculate that Plaintiffs may have been referring to Fonseca's disclaimer in his July 17, 2019 Facebook Live. (Docket No. 144 at 10 n.8). In this video, Fonseca informs the public that he is not the original publisher, does not know CPI's sources, and is merely relaying CPI's reporting. (Docket No. 34-9 at 6 (certified translation of the July 17, 2019 Facebook Live)). The Court agrees with Defendants that Fonseca's disclaimer is not an admission of doubt about CPI's article; to the contrary, he is exercising

caution by letting viewers know that he has not independently verified the claims therein. The very point of the wire service privilege is to relieve reporters from the "heavy burden" of independently verifying every story they report when their source is another reliable news source. *See* <u>Appleby</u>, 478 N.E.2d at 725 (rejecting the idea that a re-publisher has the independent duty to verify statements); <u>Nelson</u>, 667 F. Supp. at 1480 (same). That Fonseca took the extra step of informing his audience that he did not verify the allegations himself suggests to this Court that he was exercising **more** care, not acting in a "negligent, reckless, or careless manner" in discussing the CPI article. <u>Layne</u>, 146 So. at 238.

As for the alleged contradictions within the CPI article, Plaintiffs cherry-pick and mischaracterize two paragraphs from the article that are nowhere near each other. *See* <u>Turner v. Wells</u>, 879 F.3d 1254, 1263, 1267 (11th Cir. 2018) (admonishing plaintiff for "cherry pick[ing] statements . . . out of context"). The first paragraph cited by Plaintiffs states:

> The main scheme is composed of these three figures – Sánchez, Bermúdez y Miranda –, who on paper operate as 'private citizens' and 'contractors,' but who in reality constitute the top of Government, with more power than any of members of Rossello's constitutional cabinet, according to multiple sources. Likewise, it connects, at times directly and at others tangentially, with particular schemes, such as those uncovered with the arrests made by the Federal Prosecutor's

> office in July in the Department of Education,
> the Health Insurance Administration (ASES),
> and the BDO accounting firm.

(Docket No. 34-8 at 12). The second paragraph cited by Plaintiffs

states:

> One source indicated that after Hurricane
> María, Sánchez, through Christian Sobrino,
> brought the company CSA to the table, so that,
> through the Agency for Emergency and Disaster
> Management (AEMEAD), it would obtain the
> contract for post-emergency school
> inspection. The $800,000 contract was awarded
> in late September 2017 and canceled soon after
> amid criticism, including from then Secretary
> of Education Julia Keleher. Last week Keleher
> was also indicted by the feds in a scheme - so
> far unrelated - in which BDO, Scherrer and
> Velázquez were also protagonists.

Id. at 15.

The first paragraph is vague as to the connection between

Sánchez specifically and the "particular schemes" referenced. The

second paragraph merely states that the scheme involving then-

Secretary of Education Julia Keleher was so far unrelated to an

$800,000 contract Sánchez allegedly lobbied for on behalf of a

company that conducted post-emergency school inspections. It is a

stretch to say that the first paragraph directly ties Sánchez to

the Keleher scandal and that the second paragraph clears him of

any involvement in it, let alone that these paragraphs should have

given Defendants "substantial reasons to question the accuracy of

the article." Nix, 772 F. App'x at 813 (citations and internal

quotation marks omitted).

Defendants assert, and Plaintiffs do not contest, that CPI is a recognized reliable news source that has won multiple awards for its investigative journalism. (Docket No. 133 at 20). Given the CPI's status as a recognized reliable source and the lack of any red flags on the article's face, the Court finds that the wire service privilege applies to Defendants' republication of the CPI article at issue in Count Ten. The Court thus **GRANTS** Defendants' *Motion* as to Count Ten and **DISMISSES** Count Ten in its entirety.

Defendants assert that the publications at Counts Eleven and Twelve are also privileged. These, however, are not exact republications. Instead, Defendants primarily summarize and comment on the CPI's report. As many of these statements also contain opinion or rhetorical hyperbole protected by the First Amendment, the Court reviews these principles prior to discussing Defendants' challenges to Counts Eleven and Twelve.

### 4. Protected Opinion and Rhetorical Hyperbole

Statements of pure opinion-opinions "based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public"– are protected from defamation actions by the First Amendment. Turner, 879 F.3d at 1262.

Non-literal assertions of fact are also not actionable, thus assuring "that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has

traditionally added much to the discourse of this Nation." Milkovich v. Lorain J. Co., 497 U.S. 1, 20 (1990) (citing Hustler Mag., Inc. v. Falwell, 485 U.S. 46, 53-55 (1988)). *See also* Horsley v. Rivera, 292 F.3d 695, 701 (11th Cir. 2002). For example, a newspaper's characterization of a developer's negotiation strategy as "blackmail" was protected rhetorical hyperbole because "[n]o reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense." Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler, 398 U.S. 6, 14 (1970). *See also* Falwell, 485 U.S. at 50 and Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 284-86 (1974).

Whether a statement is fact or opinion and whether a statement of fact is susceptible to defamatory interpretation is a question of law for the court. Turner, 879 F.3d at 1262-63 (citations omitted). In making this determination, courts "should construe statements in their totality, with attention given to any cautionary terms used by the publisher in qualifying the statement." Id. at 1263 (citing Keller v. Miami Herald Publ'g Co., 778 F.2d 711, 717 (11th Cir. 1985)).

### a. Count Eleven

Count Eleven involves a broadcast during which several commentators discuss the contents of the CPI article. (Docket No. 130 ¶ 77). Plaintiffs concede that a portion of paragraph 77(d)

and all of paragraph 77(e) are not defamatory, thus the Court does
not discuss them here. *See supra* Part II.A.2. The other statements
at issue in Count Eleven are:

(a)   [Jay Fonseca] I think that the ce... what the
      Center for Investigative Journalism did is a
      devastating article, because even if one had
      doubts... [Ivonne Solla Cabrera] Mmhmm [Jay
      Fonseca] Because we are going to give it the
      benefit of the doubt that part of the
      information has clarifications, it is the
      complicit relationship between Elias Sánchez,
      the governor and the work team closest to him,
      of someone who is here already demonstrated
      what we all knew, that Elias Sánchez would
      continually fight with agency heads when they
      did not give his clients the contracts,…

(b)   …and I am going to say more, Carlos Contreras
      has to explain if he was contacted by Elias
      Sánchez about a contract he wanted to do via
      RFP and Elias Sánchez opposed the RFP.

(c)   [Jay Fonseca] uhm, again, the complicity of
      the governor with Elias Sánchez in this chat
      is obvious, and not just Elias Sánchez,
      another group of people who were making money
      with both hands, and, frankly, again, that is
      the main issue here... [Ivonne Solla Cabrera]
      [unintelligible] [Jay Fonseca] ...is that, is
      that they were given... [Luis Pabón Roca] It
      is not the chats? [Jay Fonseca] ...access,
      continuous perennial information, even the
      strategy of how to communicate that
      information. Even private and confidential
      information to people who later went and
      charged someone: "I got you a contract, give
      me 25%", meaning, "I got you a contract for 10
      million pesos, give me two and a half
      million." In other words, we are talking
      about, about, about people, just in case, one
      of the contracts he presumably lobbied for, of
      those mentioned in the article, is a, a multi-
      million-dollar contract, we are not talking
      about making seven hundred thousand dollars

> like Velazquez Piñol in the indictment, we are
> talking about millions and millions and
> millions...
>
> (d)   [Carlos Díaz Olivo] Since the times of the
>       Ili, of the Iliad and the Odyssey... [Luis
>       Pabón Roca] [unintelligible] [Carlos Díaz
>       Olivo] With the relationship between Patroclus
>       and Achilles, there has not... [Carlos Díaz
>       Olivo] ... had not been seen a relationship of
>       such natural solidarity as the one revealed
>       here. [Luis Pabón Roca] So well blended?
>       [Carlos Díaz Olivo] Very blended since very
>       early on in the beginning, and certainly this
>       was an ongoing activity, planned, ordered and
>       with the full knowledge of the governor. This
>       is what is behind the statements from these
>       revelations, meaning... [Jorge Rivera Nieves]
>       Who are they? Wait, wait, Patroclus, how is
>       it?   [Carlos Díaz Olivo] Patroclus and
>       Achilles [Luis Pabón Roca] And who is
>       Patroclus and who is Achilles?

(Docket No. 34-8 at 28-32 (certified translation of statements at

Docket No. 130 ¶ 77(a)-(d))).

Paragraphs 77(a)-(d) above are not actionable. The facts

asserted in these statements come from the CPI article and are

thus protected by the wire service privilege. *See* Appleby, 478

N.E.2d at 726 ("as far as a newspaper's negligence with respect to

the truth of a statement is concerned, there is no difference

between reprinting a wire service story verbatim, and accurately

restating its contents").

Plaintiffs allege that paragraphs 77(a) and 77(c) are

defamatory because they also imply that Sánchez and Rosselló were

in a sexual relationship together. Plaintiffs' uncertified

translations of paragraphs 77(a) and 77(c) describe Sánchez and
Rosselló as "lying in bed together." Defendants' certified
translations instead use the term "complicit" to describe the
relationship between Sánchez and Rosselló. Regardless of which
expression is used, the characterization is protected rhetorical
hyperbole. In the context of this publication, the comment was
clearly meant to convey the collusion between Sánchez and Rosselló
outlined in the CPI article, not a sexual relationship as
Plaintiffs allege. The reference to Sánchez "fighting" with agency
heads is also just a hyperbolic way of restating the CPI's
statement that agency heads complained of Sánchez's attempts to
intervene and pressure them into executing contracts with his
clients.

    Paragraph 77(b) is simply a follow-up question to that
allegation that Sánchez pressured agency heads. Fonseca says that
"Carlos Contreras has to explain if he was contacted by Elias
Sánchez about a contract he wanted to do via RFP and Elias Sánchez
opposed the RFP."[11] (Docket No. 34-8 at 29 (certified translation
of statement at Docket No. 130 ¶ 77(b))). This is a natural follow-

---

[11] Carlos Contreras is the former Secretary/Executive Director of the Puerto
Rico Highway and Transportation Authority. *See* UNITED STATES DEPARTMENT OF
TRANSPORTATION FEDERAL TRANSIT ADMINISTRATION, 2016 ANNUAL AGENCY PROFILE,
https://www.transit.dot.gov/sites/fta.dot.gov/files/transit_agency_profile_do
c/2016/40105.pdf; Fed. R. Evid. 201(b)(2) (allowing courts to take judicial
notice of facts that "can be accurately and readily determined from sources
whose accuracy cannot reasonably be questioned").

up question to CPI's statement that Sánchez pushed for direct contracting for his clients despite opposition by agency heads. *See* Abbas v. Foreign Pol'y Grp., LLC, 783 F.3d 1328, 1338-39 (D.C. Cir. 2015) (compiling cases from other jurisdictions holding that questions rarely give rise to successful defamation claims).

In paragraph 77(d), the commentators are merely joking–albeit in poor taste–about the information disclosed by CPI. While there is no categorical First Amendment protection for humor, Frank v. Nat'l Broad. Co., 119 A.D.2d 252, 257 (N.Y. App. Div. 1986), the nature of the exchange at paragraph 77(d) is similar to the statement at issue in Morse v. Ripken. *See* 707 So. 2d 921 (Fla. Dist. Ct. App. 1998). The plaintiff in that case argued that the defendant's statement to a reporter that plaintiff "was planning to spend the night" with the defendant's husband–a famous baseball player–was defamatory. Id. at 923. The District Court of Appeal of Florida affirmed dismissal of the complaint based on the First Amendment protection for statements of pure opinion. *See* id. The court noted that the "intent of the statement was to be humorous" and that all of the facts upon which the defendant based her opinion were conveyed to the reader of the article. Id. Therefore, the court concluded, the statement was "pure opinion, nothing more than [the defendant's] commentary on the facts presented in the article." Id.

The exchange at issue in paragraph 77(d) is similar. The commentators' allusion to Achilles and Patroclus could certainly have been interpreted as insinuating a sexual relationship between Sánchez and Rosselló. However, like in _Morse_, these distasteful jokes were clearly a "commentary on the facts" presented in the CPI article the commentators were discussing–that Sánchez and Rosselló had a mutually beneficial relationship in which Sánchez helped elect Rosselló in exchange for valuable information and access that enabled him to obtain lucrative government contracts for his clients. The intent was also to be humorous, not to make a serious allegation that Sánchez and Rosselló had a sexual relationship. Plaintiffs' own translation of that segment includes the commentators' laughter as they made these statements. Thus, like in _Morse_, the Court finds the statement at paragraph 77(d) was not meant as a literal assertion of a defamatory fact, but rather as a "satirical," though distasteful, take on disclosed and privileged facts.

In sum, the above paragraphs 77(a)-(d) are not actionable because they are a combination of privileged facts from the CPI article and Defendants' own commentary and hyperbolic statements about these disclosed and privileged facts. Defendants do not make any factual statements not already reported by CPI. Accordingly, the Court **GRANTS** Defendants' _Motion_ as to paragraphs 77(a)-(d). Given that Plaintiffs concede that the remainder of paragraph 77(d)

and all of paragraph 77(e) are not defamatory, the Court **DISMISSES** Count Eleven in its entirety.

### b. Count Twelve

Count Twelve is for a Facebook Live video in which Fonseca also discusses the aforementioned CPI article. The statements at issue there are:

(a) [Jay Fonseca] Uhh, the Center for Investigative Journalism has published a list of Elias Sánchez´s agreements, uhh, that was in the chat and, again, the important thing, for me, about this, remember, is the corruption, and that the people cannot be removed, but it is very important, that if you guys see that link, that I put there just in case, uhh... I think that the time has come for it to become quite clear already, that there seems to have been an agreement of people who helped Ricardo Rosello in the campaign after binging on contracts but at levels simply impossible to accept and that these people were in bed with the administration and the governor specifically that is really shameful.

(b) In other words, we are talking about that, for example, Elias Sánchez, uhh, according to the Center for Investigative Journalism, charged up to fifty-thousand dollars a month for lobbying contracts with the government, and could charge commissions of up to twenty-five percent. In my life I have heard that as a commission, it is normal three to ten percent, twentyfive percent, I have never heard a figure like that and the Center for Investigative Journalism affirms that this is what was being paid. In other words, we are talking about, this information being true, which is being shared with the Southern District of New York, uhh, right? Which is the district that basically oversees the most brutal cases of corruption, mafia cases, which

          go to the Southern District of New York, where
they are investigated. Well, this grand jury
that is there seems to have received evidence
of information that, according to the Center
for Investigative Journalism, is simply
incredible.

(c)    Uhh, I mean, we are talking about a criminal
organization, and I am not exaggerating, if
you read that article, that is what it says,
I am not saying that this is true because I am
not aware of that and they are not my sources,
a large part of what I have written about and
is there, right? We have said it in my TV show,
but not all of them and, frankly, some are,
uhh, very complicated, very complicated
issues. Specifically, we are talking about,
for example, how Alberto Velazquez Piñol, uhh,
who the governor claims was not appointed to
anything, well, it seems like he had access to
much more than was said, and above all, the
complicity between the lobbyist in that chat.
I mean, Ramon Rosario, who is now lobbying
too, the governor grants Carlitos Bermudez
access to, to, to ridiculously high contracts,
for public relations, uhh, Edwin Miranda, who
binged on government contracts, through
several mechanisms, and, and, and
corporations, uhh, we are talking about Elias
Sánchez making money but by, by ridiculous
numbers, uhh, and then, again, in the chat you
see the level of brotherhood and the level of
everything is fine and everything is cool.

(Docket No. 34-9 at 4-7 (certified translation of statements at

Docket No. 130 ¶ 79)).

    The statements of fact at paragraphs 79(a) and 79(c) come

from the CPI article and are thus covered by the wire service

privilege. These statements are also imbued with Defendants' own

opinions and hyperbolic statements about these disclosed,

privileged facts. Paragraph 79(a) states that Sánchez and others

were "binging on" lucrative contracts and that Sánchez was "in bed
with the administration and the governor[.]" As previously
explained, these expressions are hyperbolic restatements of the
facts disclosed in the CPI article. Paragraph 79(a) also describes
the reported collusion as "shameful." This is Defendants'
protected opinion about the facts disclosed by CPI. Therefore,
paragraphs 79(a) and 79(c) are a combination of privileged facts
from the CPI article and Defendants' own protected opinions and
hyperbolic statements about these disclosed and privileged facts.
The Court thus **GRANTS** Defendant's *Motion* as to paragraphs 79(a)
and 79(c).

On the other hand, paragraph 79(b) is not covered by the wire
service privilege because it contains a fact that could not have
come from the CPI article. Fonseca alludes to a grand jury
investigation in the District of New York not mentioned by CPI.
The Court thus **DENIES** Defendants' *Motion* as to paragraph 79(b).

### c. Other Opinion and Hyperbolic Statements

On a final note, Defendants challenge a number of other
statements on the basis that they contain protected opinion or
rhetorical hyperbole. (Docket No. 133 at 15-18 (referring to Docket
No. 35-4 at 9-10 (certified translation of statements at Docket
No. 130 ¶ 44(d)) (describing the privatization of the rezoning

process as "worrisome"[12]); Docket No. 34-4 at 5-6 (certified translation of statements at Docket No. 130 ¶ 54(b)) (describing Sánchez's role in getting Triple S on the Vital Plan for $700 million as "ugly" and insinuating a conflict of interest given his law firm's representation of Menonita as well); Docket No. 34-3 at 2 (certified translation of statement at Docket No. 130 ¶ 53(4)) (insinuating a conflict of interest in Sánchez's law firm's representation of both Triple S and Menonita); Docket No. 34-13 at 3 (certified translation of statements at Docket No. 130 ¶ 90(b)) (describing Sánchez and Rosselló as close)).

While the use of these terms is protected opinion or rhetorical hyperbole, none of the above paragraphs containing these terms can be dismissed at this stage because they also contain provable statements of fact that are capable of defamatory meaning. *See* Milkovich, 497 U.S. at 20 ("a statement of opinion relating to matters of public concern **which does not contain a provably false factual connotation** will receive full constitutional protection" (emphasis added)); Turner, 879 F.3d at 1265 ("it is well settled in Florida that commentary or opinion **based on accurate facts set forth in an article** 'are not the stuff of libel'" (citations omitted) (emphasis added)). The statements

---

[12] Defendants use the word "troubling" in their *Motion to Dismiss*, which is the term used in Plaintiffs' uncertified translation. But Defendants' certified translation of this statement uses the word "worrisome." The Court's analysis is the same regardless of which of the two terms is used.

of fact within these paragraphs that Plaintiffs allege are false
are:

- That the rezoning process was privatized and that external
  consultants (presumably Rodríguez) propose modifications
  disguised as law enforcement. (Docket No. 130 ¶ 44(d)).

- That Sánchez lobbied on behalf of Triple S for their
  inclusion in the Vital Plan. Id. ¶¶ 53(4), 54(b).

- That Rosselló gave Sánchez state secrets. Id. ¶ 90(b).

Defendants' "spin" on the above factual statements is not
actionable, but the factual statements themselves may be.
Accordingly, the Court is not able to dismiss the above paragraphs
at this stage, even if they also contain some protected opinion
and hyperbolic expression.

### III. Chart Summarizing Status of Each Allegedly Defamatory Statement

As this is a complex case involving multiple claims and
publications each with multiple allegedly defamatory statements,
the Court provides a chart summarizing the status of each claim as
a result of its ruling on this *Motion to Dismiss*.

| Count | Publication | Paragraph(s) | Status |
|-------|-------------|--------------|--------|
| One | 7/16/19 broadcast | 37(a), (c) | Survives |
| | | 37(b), (e) | Not actionable by Rodríguez because not "of and concerning" her |
| | | 37(d) | Dismissed because not "of and concerning" either Plaintiff |
| Two | 10/18/19 broadcast | 44(a)-(d) | Survives |

| | | 48(a) | Survives |
|---|---|---|---|
| Three | 7/16/19 broadcast | 48(b)-(d) | Dismissed (Plaintiffs concede not defamatory) |
| Four | 7/30/19 first Facebook post | 53(1)-(4) | Survives |
| Five | 7/30/19 Facebook Live | 54(a)-(b) | Survives |
| Six | 7/30/19 second Facebook post | 55(a) | Survives |
| Seven | 7/30/19 story | 56 | Survives |
| Eight | 6/25/19 broadcast | 66, 68(a)-(d) | Survive |
| Nine | 7/12/19 broadcast | 70(a)-(b) | Dismissed (Plaintiffs concede not defamatory) |
| | | 70(c) "Look, . . . You gave it to him. Not me, you." | Dismissed (Plaintiffs concede not defamatory) |
| | | 70(c) "And after that, . . . contracts for his benefit." | Survives |
| Ten | 7/17/19 story | 76(a)-(l) | Count dismissed in its entirety (wire service privilege) |
| Eleven | 7/17/19 broadcast | 77(a)-(e) | Count dismissed in its entirety (wire service privilege; protected opinion/rhetorical hyperbole; Plaintiffs concede not defamatory) |
| Twelve | 7/17/19 Facebook Live | 79(a), (c) | Dismissed (wire service privilege; protected opinion/rhetorical hyperbole) |
| | | 79(b) | Survives |
| Thirteen | 7/18/19 broadcast | 83(a)-(b) | Survives |

| Fourteen | 7/18/19 Facebook post | 84 | Survives |
|---|---|---|---|
| Fifteen | 6/11/19 broadcast | 90(a)-(c) | Survives |
| Sixteen | 6/21/19 broadcast | 91(a)-(b) | Survives |
| Seventeen | 7/21/19 Facebook post | 99(a)-(c) | Survives |
| Eighteen | 7/30/19 broadcast | 111(a)-(c) | Survives |
| Nineteen | 8/12/19 broadcast | 116(a) | Survives |
| | | 116(b)-(c) | Dismissed (Plaintiffs concede not defamatory) |
| Twenty | 11/25/20 Facebook post | 120 | Survives |

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' *Motion to Dismiss* at Docket No. 133.

**IT IS SO ORDERED.**

In San Juan Puerto Rico, this 6th day of September 2023.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge